**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GUY SERGE A. FRANKIN, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>     v.<br><br>BAKKT HOLDINGS, INC., GAVIN MICHAEL, ANDREW MAIN, and KAREN ALEXANDER,<br><br>               Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Guy Serge A. Frankin ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Bakkt Holdings, Inc. ("Bakkt" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Bakkt; and (c) review of other publicly available information concerning Bakkt.

## NATURE OF THE ACTION AND OVERVIEW

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired Bakkt securities between March 25, 2024 and March 17, 2025, inclusive (the "Class Period"). Plaintiff pursues claims against the Defendants under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Bakkt is a technology company which builds software related to the selling, buying, and storage of cryptocurrency. In April 2023, the Company acquired Apex Crypto LLC, a platform for integrated crypto trading, which it renamed Bakkt Crypto. This acquisition provided the Company significant new clients and financial technology partners including Webull Pay LLC ("Webull"). Prior to its acquisition of Bakkt Crypto, revenue generated from the Company's crypto services had been immaterial; however, in the year ending December 31, 2023, revenue from crypto services became a significant driver of the Company's business, accounting for 93.2% of the Company's revenue. Separately, the Company also operates a "Loyalty Solutions" segment which enables point redemption and fulfillment (including travel reservations).

3.      On March 17, 2025, after market close, Bakkt disclosed Webull was terminating its commercial agreement with the Company, effective June 14, 2025. The Company revealed that in the prior nine months ended September 30, 2024 and the full year ended December 31, 2023, **Webull made up 74% of Bakkt's crypto services revenue**. In that same period, the Company derived 98% of its revenue from crypto services. The Company also disclosed that Bank of America was terminating its loyalty services contract with the Company, effective April 22, 2025. The Company revealed Bank of America made up 17% of Bakkt's loyalty services revenue in the prior nine months ended September 30, 2024. The customer cancellations will collectively result in *a 73% loss in top line revenue going forward.*

4.      On this news, the Company's share price fell $3.50 or 27.3%, to close at $9.33 per share on March 18, 2025, on unusually heavy trading volume.

5.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants: (1) misrepresented the stability and/or diversity of its crypto services revenue; (2) failed to disclose Bakkt's Crypto services revenue was substantially dependent on a single contract with Webull; (3) misrepresented its ability to maintain key client relationships. As a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7.      The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9.      Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

10.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.     Plaintiff Guy Serge A. Frankin, as set forth in the accompanying certification, incorporated by reference herein, purchased Bakkt securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant Bakkt is incorporated under the laws of Delaware with its principal executive offices located in Alpharetta, Georgia. Bakkt's common shares trade on the New York Stock Exchange ("NYSE") under the symbol "BKKT."

13.     Defendant Gavin Michael ("Michael") was the Company's Chief Executive Officer ("CEO") from January 1, 2021 until March 26, 2024.

14.     Defendant Andrew Main ("Main") has been the Company's Chief Executive Officer ("CEO") since March 26, 2024. Prior to that, he was a director of Bakkt.

15.     Defendant Karen Alexander ("Alexander") was the Company's Chief Financial Officer ("CFO") at all relevant times.

16.     Defendants Michael, Main, and Alexander (together, the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, i.e., the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

17.     Bakkt is a technology company which builds software related to the selling, buying, and storage of cryptocurrency. In April 2023, the Company acquired Apex Crypto LLC, a platform for integrated crypto trading, which it renamed Bakkt Crypto. This acquisition provided the Company significant new clients and financial technology partners including Webull. Prior to its acquisition of Bakkt Crypto, revenue generated from the Company's crypto services had been

immaterial; however, in the year ending December 31, 2023, revenue from crypto services became a significant driver of the Company's business, accounting for 93.2% of the Company's revenue. Separately, the Company also operates a "Loyalty Solutions" segment which enables point redemption and fulfillment (including travel reservations).

## Materially False and Misleading

## Statements Issued During the Class Period

18.    The Class Period begins on March 25, 2024.[1]  On that day, Bakkt issued a press release announcing the Company's financial results for the quarter and year ended December 31, 2023.  The press release touted the Company's full year and fourth quarter financial results including an alleged "***significant increase in gross crypto services revenues driven by our acquisition of Bakkt Crypto.***" Specifically, the press release stated the following, in relevant part:

### Bakkt Reports Fourth Quarter and Full Year 2023 Results

*Quarterly gross crypto services revenues of $199.4 million and associated crypto costs and execution, clearing and brokerage fees of $197.8 million*

*Quarterly total revenues of $214.5 million include gross crypto revenues and net loyalty revenues; full year total revenues of $780.1 million*

\*                    \*                    \*

**Fourth Quarter Financial Highlights (unaudited)**

Fourth quarter 2023 results include Bakkt Crypto (f/k/a Apex Crypto, LLC), which we acquired on April 1, 2023. In accordance with GAAP, we are presenting crypto services revenue and crypto costs and execution, clearing and brokerage fees on a gross basis since we are a principal in those transactions.

---

[1] Unless otherwise stated, all emphasis in bold and italics hereinafter is added, and all footnotes are omitted.

| $ in millions | 4Q23 | 4Q22 | Increase/ (decrease) |
|---|---|---|---|
| Total revenues | $214.5 | $15.9 | N.M. |
| Crypto costs and execution, clearing and brokerage fees | 197.8 | 0.3 | N.M. |
| Goodwill, intangible and long-lived assets impairments | 67.4 | 285.9 | (76%) |
| Operating expenses, excluding crypto costs, execution, clearing and brokerage fees and goodwill, intangible and long-lived assets impairments | 27.8 | 61.7 | (55%) |
| Total operating expenses | 293.0 | 347.9 | (16%) |
| Operating loss | (78.5) | (332.0) | (76%) |
| Net loss | (78.7) | (326.4) | (76%) |
| Adjusted EBITDA loss (non-GAAP) | $(19.0) | $(30.5) | (38%) |

Note: "N.M" denotes Not Meaningful

• *Key performance indicators (including historical Bakkt Crypto data for comparison purposes):*

 o *Crypto enabled accounts of 6.2 million have continued to increase steadily year-over-year.*

 o Transacting accounts of 915,000 decreased 39% year-over-year, due to industrywide slowdown in crypto activity.

 o *Notional traded volume of $442 million decreased 35% year-over-year, primarily due to lower activity levels from Webull Pay customers and lower loyalty redemption activity in merchandise, travel and gift cards.*

 o *Assets under custody of $702 million increased 41% year-over-year, due to higher coin prices.*

• *Total revenues of $214.5 million reflect a significant increase in gross crypto services revenues driven by our acquisition of Bakkt Crypto. Net loyalty revenues of $15.1 million decreased 4% year-over-year driven by lower service revenue.*

    *        *        *

## Full Year Financial Highlights

| $ in millions | FY23 | FY22 | Increase/ (decrease) |
|---|---|---|---|
| Total revenues | $780.1 | $56.2 | N.M. |
| Crypto costs and execution, clearing and brokerage fees | 722.3 | 1.7 | N.M. |
| Goodwill, intangible and long-lived assets impairments | 90.8 | 1,833.6 | (95%) |
| Operating expenses, excluding crypto costs, execution, clearing and brokerage fees and goodwill, intangible and long-lived assets impairments | 195.0 | 239.9 | (19%) |
| Total operating expenses | 1,008.0 | 2,075.1 | (51%) |
| Operating loss | (227.9) | (2,018.9) | (89%) |
| Net loss | (225.8) | (1,989.9) | (89%) |
| Adjusted EBITDA loss (non-GAAP) | $(93.9) | $(119.7) | (22%) |

6

• Key performance indicators (including historical Bakkt Crypto data for comparison purposes):

> o Notional traded volume of $1,974.3 million decreased 49% year-over-year, primarily due to lower industrywide volume and lower activity levels from Webull Pay customers.

• Total revenues of $780.1 million reflect a ***significant increase in gross crypto services revenues driven by our acquisition of Bakkt Crypto.*** Net loyalty revenues of $53.1 million decreased 2% year-over-year driven by lower service revenue.

• Total operating expenses of $1,008.0 million reflect a significant increase in crypto costs and execution, clearing and brokerage fees driven by our acquisition of Bakkt Crypto.

• Operating loss of $227.9 million decreased year-over-year due to larger goodwill and intangible assets impairments recorded in the prior year.

• Net loss of $225.8 million decreased year-over-year.

• Adjusted EBITDA loss (non-GAAP) of $93.9 million decreased 22% year-over-year primarily due to a reduction in compensation and benefits costs.

19.    On March 25, 2024, the Company submitted its Annual Report for the full year ended December 31, 2024 on a Form 10-K filed with the SEC, affirming the previously reported financial results (the "FY23 10-K"). The FY23 10-K reported the Company's Disaggregation of Revenue by platform as well as the Company's purported revenue model, wherein "***revenue from crypto services is now a significant driver of our business, and we expect crypto services revenue to increase as we grow our client base and our customers.***" Specifically, the FY23 10-K stated the following, in relevant part:

| Platform | Year Ended December 31, 2023 | Year Ended December 31, 2022 |
|---|---|---|
| Loyalty redemption platform | 53,148 | 54,479 |
| Crypto services[b] | 726,988 | 1,745 |
| Total revenue | $ 780,136 | $ 56,224 |

*                              *                              *

**Revenue Model**

We primarily generate revenue when clients or their customers use our services to buy, sell and/or store crypto or transact in loyalty points across our platform in the following key areas:

•*Subscription and service revenue.* We receive a recurring subscription revenue stream from client platform fees as well as service revenue from software development fees and call center support.

•*Transaction revenue.* We generate transaction revenue from crypto buy/sell transactions, where we charge a markup on both legs of the transaction, and through loyalty redemption volumes, where we earn a margin from the difference of the value of the points being redeemed and the cost of fulfilling the redemption request.

Our loyalty revenue has seasonality and is typically higher in the fourth quarter, driven by holiday spending and the travel bookings.

***Revenue generated from our crypto services had been immaterial prior to our acquisition of Bakkt Crypto; however, revenue from crypto services is now a significant driver of our business, and we expect crypto services revenue to increase as we grow our client base and our customers. As a result of our acquisition of Bakkt Crypto, we expect loyalty revenue, which prior to the Bakkt Crypto acquisition was the source of substantially all of our revenue, to be a smaller percentage of overall revenue in the future as the revenue grows from our crypto product and service offerings.***

20.    The FY23 10-K further touted the Company's purported growth prospects, ability to service growing customers, and partner relationships, stating as follows in relevant part:

We go to market using a platform strategy, driven by our clients. ***We partner with leading companies and expect to grow customers on our platform through those relationships, in addition to our direct institutional clients. We have already built an extensive network of clients across numerous industries including financial institutions, merchants and travel and entertainment.*** These clients include Webull, Public.com, Blockchain.com, Swan Bitcoin, and Caesars. We believe this strategy will enable us to add transacting accounts and volume more quickly and more efficiently than a direct-to-consumer model, given our limited operating history and the novelty of the crypto space for some customers.

***As part of this approach, we have developed our platform to be flexible and scalable to accommodate how different clients may want to implement our solutions.*** Depending on each client's specific needs and objectives, that client can choose to add one, some or all of our capabilities, and can also choose the manner in which those capabilities are enabled. Clients can choose to fully or partially

embed our capabilities directly through Bakkt hosted user interfaces such as our Custody client portal.

We believe our growth will come from adding clients and correspondingly, their customers, and increasing transaction activity as well as strategic acquisitions. Our acquisition of Bakkt Crypto has provided scale and meaningful transaction volume from Bakkt Crypto's active client base which we are working to leverage to sell additional products and services on the same platform. Leveraging Bakkt Crypto's proprietary trading platform and existing relationships with liquidity providers, we provide a wide range of assets and competitive pricing to our clients.

21.     The FY23 10-K also purported to warn of the Company "dependence on a limited number of clients" stating as follows, in relevant part:

> ***A large percentage of our revenue is concentrated with a small number of clients; the loss of any such client would materially and adversely affect our business, financial condition, results of operations and future prospects. Moreover, because of our B2B2C go-to-market model, the loss of any client – regardless of the reason – increases the risk that the customers that originally emanated from that client will transition to another provider or stop doing business with us, which would harm our business.***
>
> The concentration of a significant portion of our business and transaction volume with a limited number of clients exposes us disproportionately to the risk of any of those clients choosing to no longer partner with us, to the economic performance of such clients or their respective industries or to any events, circumstances, or risks affecting such clients or their respective industries. Any such loss could make our platform less appealing to existing and potential customers. Accordingly, the loss of any significant client relationship could materially and adversely affect our business, results of operations, financial condition and future prospects.

22.     On May 15, 2024, Bakkt issued a press release announcing the Company's results for the quarter ended March 31, 2024. The press release touted the Company's first quarter 2024 finanical results, including the Company's alleged "***significant increase in gross crypto services revenues driven by the acquisition of Bakkt Crypto.***" Specifically, the press release stated as follows, in relevant part:

> - *$854.6 million total revenues including gross crypto revenues and net loyalty revenues*
>
> - *Strong client crypto trading activity with notional traded volume up 324% quarter-over-quarter*

*- $48.8 million operating expenses excluding crypto costs, execution, clearing and brokerage fees, down 16% year-over-year*

*                    *                    *

**Key Performance Indicators (including historical Bakkt Crypto data):**

• ***Crypto enabled accounts grew to 6.3 million, up 9% YoY.***

• ***Transacting accounts decreased 34% year-over-year to 779,000, due to lower loyalty redemption and active crypto trading accounts.***

• Notional traded volume increased 64% year-over-year to $1,041 million, primarily due to strong crypto trading volume partially offset by lower loyalty redemption activity in travel and gift cards.

• Assets under custody increased 76% year-over-year to $1,233 million, due to higher coin prices.

**First Quarter 2024 Financial Highlights (unaudited):**

• Total revenues of $854.6 million reflect a ***significant increase in gross crypto services revenues driven by the acquisition of Bakkt Crypto***. Net loyalty revenues of $13.2 million increased 4% year-over-year driven by higher service revenue.

*                    *                    *

First quarter 2024 results include Bakkt Crypto (f/k/a Apex Crypto, LLC), acquired on April 1, 2023. In accordance with GAAP, crypto services revenue and crypto costs and execution, clearing and brokerage fees are presented on a gross basis as the Company is a principal in those transactions.

| $ in millions | 1Q24 | 1Q23 | Increase/ (decrease) |
|---|---|---|---|
| Total revenues | $854.6 | $13.2 | N.M. |
| Crypto costs and execution, clearing and brokerage fees | 837.6 | 0.4 | N.M. |
| Operating expenses, excluding crypto costs and execution, clearing and brokerage fees | 48.8 | 58.3 | (16%) |
| Total operating expenses | 886.4 | 58.7 | 1411% |
| Operating loss | (31.8) | (45.4) | (30%) |
| Net loss | (21.3) | (44.9) | (53%) |
| Adjusted EBITDA loss (non-GAAP) | $(16.3) | $(28.9) | (44%) |

Note: "N.M" denotes Not Meaningful

23.    On May 15, 2024, the Company submitted its quarterly report for the period ended March 31, 2024, on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report further reported the Company's Disaggregation of Revenue by

platform and touted the Company's clients and its purported "**extensive network across numerous industries**" as well as the Company's alleged ability to "**meet the capability demands of our clients.**" Specifically, the quarterly report stated as follows, in relevant part:

| Platform | Three Months Ended March 31, 2024 | Three Months Ended March 31, 2023 |
|---|---|---|
| Loyalty redemption platform, net | 13,242 | 12,776 |
| Crypto services | 841,340 | 443 |
| Total revenue | $ 854,582 | $ 13,219 |

*            *            *

***Key Factors Affecting Our Performance***

**Growing Our Client Base**

Our ability to increase our revenue stream depends on our ability to grow clients on our platform. ***We collaborate with leading brands and have built an extensive network across numerous industries including financial institutions, merchants and travel and entertainment.*** To date, management has been focused on building through clients within a business-to-business-to-consumer ("B2B2C") model. Our goal is to provide these clients opportunities to leverage our capabilities either through their existing environment or by leveraging our platform. Our acquisition of Bakkt Crypto Solutions complements our B2B2C growth strategy by broadening our business partnerships to fintechs and neo-banks.

**Product Expansion and Innovation**

The crypto marketplace is rapidly evolving. We believe our ability to continue innovating our platform will increase the attractiveness of our platform to clients. ***Our ability to meet the capability demands of our clients will allow us to continue to grow revenue***.

24.      On August 14, 2024, Bakkt issued a press release announced the Company's finanical results for the quarter ended June 30, 2024. The press release touted the Company's second quarter 2024 finanical results, including the Company's alleged "***increase in gross crypto services revenues driven by the acquisition of Bakkt Crypto.***" Specifically, the press release stated as follows, in relevant part:

 ***$509.9 million total revenues including gross crypto revenues and net loyalty revenues***

*$36.8 million operating expenses excluding crypto costs, execution, clearing and brokerage fees, down 43.1% year-over-year, 24.6% sequentially*

\*                    \*                    \*

**Key Performance Indicators:**

• Crypto enabled accounts grew to 6.4 million, up 6.7% YoY.

• Transacting accounts decreased 39.1% year-over-year to approximately 719,281, primarily due to a large customer's reduced activity in international markets.

• Notional traded volume increased 26.6% year-over-year to $672 million, primarily due to higher trading prices for crypto assets.

• Assets under custody increased 47.7% year-over-year to $975 million, primarily due to higher trading prices for crypto assets.

**Second Quarter 2024 Financial Highlights (unaudited):**

• Total revenues of $509.9 million reflect an ***increase in gross crypto services revenues driven by Bakkt Crypto.*** Net loyalty revenues of $12.8 million increased 4% year-over-year driven by higher subscription and services revenue.

\*                    \*                    \*

| $ in millions | 2Q24 | 2Q23 | Increase/ (decrease) |
|---|---|---|---|
| Total revenues[1] | $509.9 | $347.6 | 46.7% |
| Crypto costs and execution, clearing and brokerage fees | 495.1 | 334.0 | 48.2% |
| Operating expenses, excluding crypto costs and execution, clearing and brokerage fees | 36.8 | 64.7 | (43.1%) |
| Total operating expenses | 531.9 | 398.7 | 33.4% |
| Operating loss | (22.0) | (51.1) | (56.9%) |
| Net loss | (35.5) | (50.5) | (29.7%) |
| Adjusted EBITDA loss (non-GAAP) | ($17.9) | ($24.5) | (26.9%) |

Note: "N.M" denotes Not Meaningful

25.     On August 14, 2024, the Company submitted its quarterly report for the period ended June 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report further reported the Company's Disaggregation of Revenue by platform and touted the Company's clients and its purported "***extensive network across***

*numerous industries*" as well as the Company's alleged ability to "*meet the capability demands of our clients.*" Specifically, the quarterly report stated as follows, in relevant part:

| Platform | Three Months Ended June 30, 2024 | Three Months Ended June 30, 2023 | Six Months Ended June 30, 2024 | Six Months Ended June 30, 2023 |
|---|---|---|---|---|
| Loyalty redemption platform, net | $ 12,757 | $ 12,296 | $ 25,999 | $ 25,072 |
| Crypto services | 497,141 | 335,333 | 1,338,481 | 335,776 |
| Total revenue | $ 509,898 | $ 347,629 | $ 1,364,480 | $ 360,848 |

\*                          \*                          \*

### Key Factors Affecting Our Performance

### Growing Our Client Base

Our ability to increase our revenue stream depends on our ability to grow clients on our platform. *We collaborate with leading brands and have built an extensive network across numerous industries including financial institutions, merchants and travel and entertainment.* To date, management has been focused on building through clients within a business-to-business-to-consumer ("B2B2C") model. Our goal is to provide these clients opportunities to leverage our capabilities either through their existing environment or by leveraging our platform. Our acquisition of Bakkt Crypto Solutions complements our B2B2C growth strategy by broadening our business partnerships to fintechs and neo-banks.

### Product Expansion and Innovation

The crypto marketplace is rapidly evolving. We believe our ability to continue innovating our platform will increase the attractiveness of our platform to clients. *Our ability to meet the capability demands of our clients will allow us to continue to grow revenue.*

26.     On November 14, 2024, Bakkt issued a press release announcing the Company's results for the quarter ended September 30, 2024. The press release touted the Company's third quarter 2024 finanical results, including the Company's alleged "*increase in gross crypto services revenues driven by the acquisition of Bakkt Crypto.*" Specifically, the press release stated as follows, in relevant part:

### Third Quarter 2024 Key Performance Indicators:

• *Crypto enabled accounts grew to 6.5 million, up 6.7% year-over-year.*

• ***Notional traded volume increased 30.1% year-over-year to $476.5 million, primarily due to stronger crypto market activity.***

• Assets under custody increased 85.5% year-over-year to $938.7 million, primarily due to higher trading prices for crypto assets.

• Loyalty transacting accounts decreased 41.6% year-over-year to approximately 610,568, primarily due to a credit card program divestiture by a large loyalty client.

**Third Quarter 2024 Financial Highlights (unaudited):**

• ***Total revenues of $328.4 million reflect an increase in gross crypto services revenues driven by Bakkt Crypto. Net loyalty revenues of $12.1 million decreased 7.2% year-over-year driven by lower notionally traded volume and redemption.***

*        *        *

• Operating loss of $27.4 million improved 48.2% year-over-year primarily due to the lapse of a $23.3 million goodwill and intangible asset impairment in third quarter of 2023 along with higher crypto services revenue, and lower compensation, SG&A and acquisition related costs.

• Net loss improved 87.8% year-over-year to $6.3 million as the third quarter of 2024 benefited from a $20.0 million gain on the fair value of warrant liability.

• Adjusted EBITDA loss (non-GAAP) increased 9.7% year-over-year to $23.7 million as the second half of 2023 benefited from a temporary brokerage business revenue share adjustment with WeBull and a decrease in loyalty revenue.

| $ in millions | 3Q24 | 3Q23 | Increase/ (decrease) |
|---|---|---|---|
| Total revenues[1] | $328.4 | $204.8 | 60.4% |
| Crypto costs and execution, clearing and brokerage fees | 315.0 | 190.1 | 65.8% |
| Operating expenses, excluding crypto costs and execution, clearing and brokerage fees | 40.8 | 67.5 | (39.7%) |
| Total operating expenses | 355.8 | 257.6 | 38.1% |
| Operating loss | (27.4 | (52.9) | (48.2%) |
| Net loss | (6.3) | (51.7) | (87.8%) |
| Adjusted EBITDA loss (non-GAAP) | ($23.7) | ($21.6) | (9.7%) |

27.    On November 14, 2024, the Company submitted its quarterly report for the period ended September 30, 2024 on a Form 10-Q filed with the SEC, affirming the previously reported financial results. The quarterly report further reported the Company's Disaggregation of Revenue by platform and touted the Company's clients and its purported "***extensive network across***

*numerous industries*" as well as the Company's alleged ability to "***meet the capability demands of our clients.***" Specifically, the quarterly report stated as follows, in relevant part:

| Platform | Three Months Ended September 30, 2024 | | Three Months Ended September 30, 2023 | | Nine Months Ended September 30, 2024 | | Nine Months Ended September 30, 2023 | |
|---|---|---|---|---|---|---|---|---|
| Loyalty redemption platform, net | $ | 12,086 | $ | 13,024 | $ | 38,085 | $ | 38,096 |
| Crypto services | | 316,333 | | 191,750 | | 1,654,814 | | 527,526 |
| Total revenue | $ | 328,419 | $ | 204,774 | $ | 1,692,899 | $ | 565,622 |

\*              \*              \*

### Key Factors Affecting Our Performance

### Growing Our Client Base

Our ability to increase our revenue stream depends on our ability to grow clients on our platform. ***We collaborate with leading brands and have built an extensive network across numerous industries including financial institutions, merchants and travel and entertainment.*** To date, management has been focused on building through clients within a B2B2C model. Our goal is to provide these clients opportunities to leverage our capabilities either through their existing environment or by leveraging our platform. Our acquisition of Bakkt Crypto Solutions complements our B2B2C growth strategy by broadening our business partnerships to fintechs and neobanks.

### Product Expansion and Innovation

The crypto marketplace is rapidly evolving. We believe our ability to continue innovating our platform will increase the attractiveness of our platform to clients. ***Our ability to meet the capability demands of our clients will allow us to continue to grow revenue.***

28.     The above statements identified in ¶¶ 18-27 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants: (1) misrepresented the stability and/or diversity of its crypto services revenue; (2) failed to disclose Bakkt's Crypto services revenue was substantially dependent on a single contract with Webull; (3) misrepresented its ability to maintain key client relationships. As a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

15

### Disclosures at the End of the Class Period

29.     On March 17, 2025, after market close, Bakkt issued a press release which disclosed Webull was terminating its  commercial agreement with the Company, effective June 14, 2025. The Company revealed that in the prior nine months ended September 30, 2024 and the full year ended December 31, 2023, ***Webull made up 74% of Bakkt's crypto services revenue***. In that same period, the Company derived 98% of its revenue from crypto services. The Company also disclosed that Bank of America was terminating its loyalty services contract with the Company, effective April 22, 2025.     The Company revealed Bank of America made up 17% of Bakkt's loyalty services revenue in the prior nine months ended September 30, 2024. The customer cancellations will collectively result in **a 73% loss in top line revenue going forward.** Specifically, the press release stated the following, in relevant part:

> Bakkt Holdings, Inc. (the "Company") received notice from Bank of America, N.A. ("Bank of America") that Bank of America would not renew its commercial agreement with the Company. As a result, such agreement will expire in accordance with its terms on April 22, 2025, subject to the Company's obligation to maintain services for up to a 12-month transition period. Bank of America represented approximately 16% and 17% of the Company's loyalty services revenue in in the year ended December 31, 2023 and the nine months ended September 30, 2024, respectively.

> The Company also received notice from Webull Pay LLC ("Webull") that Webull will not renew its commercial agreement with the Company. As a result, such agreement will expire in accordance with its terms on June 14, 2025. Webull represented approximately 74% of the Company's crypto services revenue in both the year ended December 31, 2023 and the nine months ended September 30, 2024.

30.     On this news, the Company's share price fell $3.50 or 27.3%, to close at $9.33 per share on March 18, 2025, on unusually heavy trading volume.

31.     Then, on March 20, 2025, the Company revealed the loss of Webull "raise[s] substantial doubt about [the Company's] ability to meet our obligations for at least 12 months from the date of issuance of these consolidated financial statements."

## CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Bakkt securities between March 25, 2024 and March 17, 2025, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

33.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Bakkt's shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of Bakkt shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by Bakkt or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

34.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

35.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

36.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Bakkt; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

37.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

38.    The market for Bakkt's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Bakkt's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Bakkt's securities relying upon the integrity of the market price of the Company's securities and market information relating to Bakkt, and have been damaged thereby.

39.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Bakkt's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or

misleading because they failed to disclose material adverse information and/or misrepresented the truth about Bakkt's business, operations, and prospects as alleged herein.

40.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Bakkt's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

41.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

42.    During the Class Period, Plaintiff and the Class purchased Bakkt's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

43.    As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were

materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Bakkt, their control over, and/or receipt and/or modification of Bakkt's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Bakkt, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

44.    The market for Bakkt's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Bakkt's securities traded at artificially inflated prices during the Class Period.  On December 16, 2024, the Company's share price closed at a Class Period high of $32.44 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Bakkt's securities and market information relating to Bakkt, and have been damaged thereby.

45.    During the Class Period, the artificial inflation of Bakkt's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Bakkt's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Bakkt and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all

relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

46.     At all relevant times, the market for Bakkt's securities was an efficient market for the following reasons, among others:

(a)     Bakkt shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Bakkt filed periodic public reports with the SEC and/or the NYSE;

(c)     Bakkt regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Bakkt was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

47.     As a result of the foregoing, the market for Bakkt's securities promptly digested current information regarding Bakkt from all publicly available sources and reflected such information in Bakkt's share price. Under these circumstances, all purchasers of Bakkt's securities during the Class Period suffered similar injury through their purchase of Bakkt's securities at artificially inflated prices and a presumption of reliance applies.

48.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

49.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Bakkt who knew that the statement was false when made.

## FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and

### Rule 10b-5 Promulgated Thereunder

### Against All Defendants

50.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

51.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Bakkt's securities at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

52.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Bakkt's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

53.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Bakkt's financial well-being and prospects, as specified herein.

54.     Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Bakkt's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Bakkt and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

55.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

56.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Bakkt's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

57.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Bakkt's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Bakkt's securities during the Class Period at artificially high prices and were damaged thereby.

58.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Bakkt was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Bakkt securities, or, if they had

acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

59.      By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

60.      As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**

**Violation of Section 20(a) of The Exchange Act**

**Against the Individual Defendants**

61.      Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

62.      Individual Defendants acted as controlling persons of Bakkt within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

63. In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

64. As set forth above, Bakkt and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: April 2, 2025

_/s/ Rebecca Dawson_
**GLANCY PRONGAY & MURRAY LLP**
Rebecca Dawson
230 Park Ave, Suite 358
New York, New York 10169
Telephone: (213) 521-8007
Email: rdawson@glancylaw.com

Robert V. Prongay
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

**THE LAW OFFICES OF FRANK R. CRUZ**
Frank R. Cruz
2121 Avenue of the Stars, Suite 800
Century City, CA 90067
Telephone: (310) 914-5007

_Counsel for Plaintiff Guy Serge A. Frankin_

# SWORN CERTIFICATION OF PLAINTIFF

## BAKKT HOLDINGS, INC. SECURITIES LITIGATION

I, Guy Serge A. Frankin, certify that:

1. I have reviewed the Complaint, adopt its allegations, and authorize the filing of a Lead Plaintiff motion on my behalf.

2. I did not purchase the Bakkt Holdings, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Bakkt Holdings, Inc. securities during the Class Period set forth in the Complaint are as follows:

   (See attached transactions)

5. I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

3/24/2025
_____           _____
          Date                                    Guy Serge A. Frankin

**Guy Serge A. Frankin's Transactions in Bakkt Holdings, Inc. (BKKT)**

**Account 1**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 6/12/2024 | Bought | 100 | $19.9000 |
| 6/12/2024 | Bought | 100 | $19.9104 |
| 6/12/2024 | Bought | 200 | $19.9300 |
| 6/12/2024 | Bought | 1 | $19.9900 |
| 6/12/2024 | Bought | 400 | $19.8740 |
| 6/12/2024 | Bought | 200 | $19.9200 |
| 6/12/2024 | Bought | 3,098 | $19.9900 |
| 6/12/2024 | Bought | 200 | $19.7900 |
| 6/12/2024 | Bought | 100 | $19.9100 |
| 6/12/2024 | Bought | 1 | $19.9300 |
| 6/12/2024 | Bought | 100 | $19.9100 |
| 6/13/2024 | Bought | 263 | $20.2850 |
| 6/13/2024 | Bought | 2,737 | $20.6300 |
| 1/23/2025 | Bought | 140 | $30.3600 |
| 1/23/2025 | Bought | 300 | $30.3600 |
| 1/23/2025 | Bought | 50 | $30.3700 |
| 1/23/2025 | Bought | 300 | $30.3600 |

**Account 2**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 1/23/2025 | Bought | 22 | $28.9900 |
| 1/23/2025 | Bought | 100 | $28.9400 |
| 1/23/2025 | Bought | 100 | $30.7230 |
| 1/23/2025 | Bought | 100 | $30.7400 |
| 1/23/2025 | Bought | 200 | $30.7400 |